STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Abel SARABIA, Defendant-Appellant-Cross-Petitioner.

Supreme Court

*No. 82–963–CR. Argued February 29, 1984.—*
*Decided May 30, 1984.*

(Also reported in 348 N.W.2d 527.)

For the plaintiff-respondent-petitioner the cause was argued by *Jeffrey M. Gabrysiak,* assistant attorney gen-

eral, with *Bronson C. La Follette,* attorney general, on the briefs.

For the defendant-appellant and cross-petitioner there were briefs by *Robert G. LeBell,* Milwaukee, and oral argument by *Mr. LeBell.*

WILLIAM G. CALLOW, J.   This is a review of an unpublished decision of the court of appeals reversing a judgment of conviction for second-degree murder and remanding for a new trial, affirming the judgment of conviction for injury by conduct regardless of life and carrying a concealed weapon, and affirming the order of the trial court denying the defendant's postconviction motions. The judgment of conviction and order denying the motions were entered by the circuit court for Rock county, Judge Edwin C. Dahlberg. We reverse in part and affirm in part the decision of the court of appeals.

The primary issue presented on appeal is whether a defendant charged with second-degree murder is entitled to lesser included offense jury instructions on manslaughter (imperfect self-defense) and homicide by reckless conduct when he testifies at trial that he did not engage in the conduct underlying the offense charged.

Testimony at trial revealed that the events leading to the crimes began on the evening of December 18, 1980. That night the defendant, Abel Sarabia, was attacked by a knife-wielding man outside the Socialite Club, a basement bar located in Beloit, Wisconsin. The defendant ran into the bar where the bartender, Clarence Owens, helped him treat his wounded hand. Before he left the bar and returned to his car, the defendant threw some money across the bar to Owens. Owens testified that the defendant said it was a tip; the defendant testified that he merely entrusted the money to Owens for safekeeping.

The next evening, December 19, 1980, the defendant, accompanied by a friend, Jose Arreguin, returned to the

Socialite Club. After having a couple drinks, the defendant demanded that Owens return the money the defendant had given him the previous evening. Owens refused to give the defendant the money. Owens then walked over to the cash register and opened a drawer beneath the register where a "house gun" was usually kept. Finding no gun, Owens began walking toward the door leading to the kitchen adjoining the bar area. In the meantime, the defendant pulled out a gun and aimed it in the direction of Owens. As Owens approached the door, the defendant shot him in the upper right back area. The defendant then fired at least one other shot, hitting the kitchen door area. The defendant fled up the stairs leading from the bar to the street. He was followed by his friend, Jose Arreguin. At this point, another shot was fired, and Arreguin fell face down on the stairs. Arreguin died shortly thereafter. The defendant was charged with second-degree murder[1] for the death of Arreguin, injury by conduct regardless of life for the wounding of Owens, and carrying a concealed weapon.

At trial the defendant admitted firing the shots at Owens, but he unequivocally denied that he had fired the last shot which struck Arreguin. The defendant testified that he heard a shot just as he was about to exit the bar. He claimed that he thought he was being fired at, but he did not feel himself hit. He further testified that he did not hear anyone following behind him on the stairs. He testified that he returned to his car, waited a few moments for Arreguin, but left because he was afraid peo-

---

[1] Section 940.02, Stats., provides:

"**Second-degree murder.** Whoever causes the death of another human being under either of the following circumstances is guilty of a Class B felony:

"(1) By conduct imminently dangerous to another and evincing a depraved mind, regardless of human life; or

"(2) As a natural and probable consequence of the commission of or attempt to commit a felony."

ple in the bar would shoot him. On cross-examination the defendant again denied that he fired his gun at any time while he was running up the stairs to exit the bar.

One witness, Durante Carr, testified that he saw the defendant run up the stairs with Arreguin following behind. Carr testified that, when Arreguin had gone up a few steps, the defendant turned around and shot his gun, and Arreguin fell face down on the steps. None of the witnesses had a gun or saw anyone other than the defendant with a gun during the shooting incident.

Three fired bullets were recovered from the scene of the crime, and one was removed from Arreguin's body. A ballistics expert testified that the bullets were of the .38, .357 caliber type and were consistent with the Smith & Wesson Nyclad-type bullet. The ballistics expert was unable to establish conclusively that the bullets were fired from the defendant's gun, a Smith & Wesson Combat Masterpiece, Model .38 special caliber. However, the expert stated that the general rifling characteristics of the crime scene bullets corresponded to the general rifling characteristics of bullets test-fired from the defendant's gun.

At the close of the trial, the defendant requested nine lesser included offense instructions, including manslaughter (imperfect self-defense) and homicide by reckless conduct, with regard to the second-degree murder charge. The trial court declined to grant the request for the instructions, finding that no reasonable view of the evidence would permit a jury to acquit the defendant of the second-degree murder charge and convict of a lesser included offense. In so deciding, the trial court noted the defendant's testimony that he did not cause Arreguin's death and the testimony adduced by the state supporting the charge of second-degree murder. The defendant was convicted on all three charges. A judgment of conviction was entered on September 9, 1981. The defendant filed

motions for postconviction relief, alleging numerous errors during the trial. The trial court denied the motions. The defendant then appealed the judgment of conviction and the order of the trial court denying the defendant's postconviction motions to the court of appeals.

The court of appeals affirmed the trial court on all issues except the defendant's requested lesser included offense instructions on the second-degree murder charge. The court of appeals determined that the evidence was sufficient for the jury reasonably to acquit the defendant of second-degree murder and to find him guilty of manslaughter (imperfect self-defense) or homicide by reckless conduct. Accordingly, the court of appeals reversed the conviction for second-degree murder and remanded the case for a new trial, with directions to give those lesser included instructions. The court affirmed the convictions for injury by conduct regardless of life and carrying a concealed weapon.

Submission of a lesser included offense instruction is proper *only* when there are reasonable grounds in the evidence both for acquittal on the greater charge and conviction on the lesser offense. *Jordan v. State,* 93 Wis. 2d 449, 468, 287 N.W.2d 509 (1980). This rule was stated in detail in *State v. Bergenthal,* 47 Wis. 2d 668, 674–75, 178 N.W.2d 16 (1970) (footnotes omitted), *cert. denied,* 402 U.S. 972 (1971):

" '. . . [I]f the evidence, in one reasonable view, would suffice to prove guilt of the higher degree beyond a reasonable doubt, and if, under a different, but reasonable view, the evidence would suffice to prove guilt of the lower degree beyond a reasonable doubt, but leave a reasonable doubt as to some element included in the higher degree but not in the lower, the court should, if requested, submit the lower degree as well as the higher. . . .'

"The key word in the rule is 'reasonable.' The rule does not suggest some near automatic inclusion of all lesser but included offenses as additional options to a jury.

Only if 'under a different, but reasonable view,' the evidence is sufficient to establish guilt of the lower degree and also leave a reasonable doubt as to some particular element included in the higher degree but not the lower, should the lesser crime also be submitted to the jury. However, there is not to be read into the rule the requirement that 'there are not reasonable grounds on the evidence to convict of the greater offense.' That goes too far. Where the defendant is able to demonstrate that there is no reasonable view of the evidence that warrants conviction on the greater offense, and the trial court agrees, there remains no issue on such charge to go to the jury. The purpose of multiple verdicts is to cover situations where under different, but reasonable, views of the evidence there are grounds either for conviction of the greater or of the lesser offense. The lesser degree verdict is not to be submitted to the jury unless there exists reasonable grounds for conviction of the lesser offense and acquittal on the greater."

In this regard, we have further stated:

"To protect the defendant from violation of due process or denial of the right to trial by jury, this court has held that neither the trial court nor the appellate court may look to the totality of the evidence. The question is rather:

" '. . . whether a reasonable construction of the evidence will support the defendant's theory viewed in the most favorable light it will "reasonably admit . . . from the standpoint of the accused." *Ross v. State, supra.* If this question is answered affirmatively, then *it is for the jury, not the trial court or this court, to determine whether to believe defendant's version of events* [supporting the submission of lesser included offense instructions].' *State v. Mendoza,* 80 Wis. 2d 122, 153, 258 N.W. 2d 260 (1977)."

*Hawthorne v. State,* 99 Wis. 2d 673, 684, 299 N.W.2d 866 (1981) (emphasis added).

We believe that the decision whether to give a lesser included offense instruction is also dependent upon the na-

ture of the crime charged, coupled with the testimony of the defendant. A special situation arises, as in this case, where the defendant presents wholly exculpatory testimony as to the charged offense but requests a lesser included offense instruction which is directly contrary to the defendant's version of the facts. In this case, if the defendant's testimony that he did not fire the fatal shot were to be believed, he was not guilty of any crime in connection with Arreguin's death. Thus, it would appear to be inconsistent for the defendant to argue that he did not commit the act which forms the basis for the crime charged, but then to claim that he is entitled to an instruction on a lesser offense which could only be found had the defendant done the underlying act.

We conclude, however, that in viewing the evidence in the most favorable light it will reasonably admit from the standpoint of the accused, *Ross v. State*, 61 Wis. 2d 160, 172, 211 N.W.2d 827 (1973), we must take into account the fact that the jury could reasonably disbelieve the defendant's version of the facts. We recognize that "there may be 'some evidence' of a lesser offense even though this depends on an inference of a state of facts that is ascertained by believing defendant as to part of his testimony and prosecution witnesses on the other points in dispute." *Belton v. United States*, 382 F.2d 150, 155 (D.C. Cir. 1967). We hold that the defendant or the state may request and receive lesser included offense instructions, even when the defendant has given exculpatory testimony, if under a reasonable but different view of the record, the evidence and any testimony other than that part of the defendant's testimony which is exculpatory supports acquittal on the greater charge and conviction on the lesser charge.

We note that the defendant's exculpatory testimony does not in itself support the giving of *any* lesser in-

cluded offense instruction.[2] Thus, we must review the evidence, the defendant's nonexculpatory testimony, and other witnesses' testimony to determine whether submission of the defendant's requested lesser included offense instructions was warranted. We conclude from a review of the record that there was no reasonable ground in the record for acquittal on the second-degree murder charge.

The first question under second-degree murder is whether the defendant caused the death of another human being. Sec. 940.02, Stats. One witness testified that he saw the defendant fire a shot at Arreguin. The bullet recovered from Arreguin's body showed characteristics consistent with bullets test-fired from the defendant's gun. Testimony showed that no other person in the bar had a gun or fired a gun during the incident. This evidence and testimony was sufficient for the jury reasonably to find beyond a reasonable doubt that the defendant caused Arreguin's death.

The second question under second-degree murder is whether the defendant killed Arreguin "[b]y conduct

---

[2] The state argues that the defendant should be "bound by his own testimony," citing *Boyer v. State,* 91 Wis. 2d 647, 671, 284 N.W.2d 30 (1979). As we noted in *Walker v. State,* 99 Wis. 2d 687, 693–94, 299 N.W.2d 861 (1981), we did not in *Boyer* establish a "rule" to this effect. If *Boyer* is carefully read, it is apparent that the defendant's testimony was one factor to take into account in determining whether to give a lesser included offense instruction. In *Boyer,* after considering the defendant's testimony, we concluded that there was no reasonable ground in the evidence, *"considered as a whole,"* to support submission of the lesser included offense instruction. *Boyer,* 91 Wis. 2d at 671 (emphasis added). We believe that the *Boyer* decision supports our holding in this case that the defendant may be entitled to instructions contrary to his testimony if there are other reasonable grounds in the record to support submission of the requested instructions.

imminently dangerous to another and evincing a depraved mind, regardless of human life." Sec. 940.02(1), Stats. We conclude that the jury reasonably could find that the defendant's conduct was imminently dangerous and evinced a depraved mind, regardless of human life. For conduct to be imminently dangerous to another, " '[i]t must have been conduct inherently and consciously *dangerous to life and not such as might casually produce death by misadventure.'* " *Wangerin v. State,* 73 Wis. 2d 427, 434, 243 N.W.2d 448 (1976) (emphasis in original).

"To constitute a depraved mind, more than a high degree of negligence or recklessness must exist. The mind must not only disregard the safety of another but be devoid of regard for the life of another. . . . A depraved mind lacks a moral sense, an appreciation of life, is unreasonable and lacks judgment. A depraved mind has a general intent to do the acts and the consciousness of the nature of the acts and possible result but lacks the specific intent to do the harm." *State v. Weso,* 60 Wis. 2d 404, 411–12, 210 N.W.2d 442 (1973).

Wis. JI—Criminal sec. 1110 states, in part:

". . . The depravity of mind referred to in second degree murder exists when the conduct causing death demonstrates an utter lack of concern for the life and safety of another and for which conduct there is no justification or excuse."

The testimony and evidence showed that the defendant repeatedly fired his gun in a bar with several people in it. The defendant shot the bartender and admitted that he intended to hit him. The defendant fired at the bartender even after he was hit. These actions were done with no apparent provocation or under no circumstances which might justify the use of deadly force. The defendant's course of conduct when leaving the bar after the bartender refused to give him any money, including the defendant's repeated firings of the gun, was evidence

that he was prepared to shoot and kill anyone who might get in his way. When the defendant fired the shot which hit Arreguin, he apparently turned around, pointed his gun back into the bar, and fired the gun aiming down the stairs leading to the bar.

We conclude that the defendant's act of firing a loaded gun directly into a bar where there were people present constituted conduct imminently dangerous to human life. Under the circumstances, this clearly was conduct evincing a depraved mind with utter disregard for the life of his victim. "The excessiveness of the conduct in relation to its purpose, the nature of the conduct and the disregard for the possible result of such conduct evinces an unreasonable mind in that it lacked balance, a moral sense, and judgment and hence was depraved." *Weso,* 60 Wis. 2d at 412. We do not find any other evidence in the record which would raise a reasonable doubt that the defendant's conduct evinced a depraved mind, regardless of human life. We find no error in the trial court's refusal to submit any lesser included offense instructions. Accordingly, we reverse the court of appeals' determination that the defendant was entitled to lesser included offense instructions on manslaughter (imperfect self-defense) and homicide by reckless conduct; we affirm the court of appeals' decision that the defendant was not entitled to any of the other requested lesser included offense instructions.

In reaching its decision, the court of appeals did not address two other issues which the defendant raised, namely, whether the trial court erred in admitting certain expert testimony and whether the state improperly failed to turn over discoverable or exculpatory evidence. We conclude that neither issue has merit.

The defendant argues that the trial court erroneously permitted three of the state's witnesses to testify on mat-

ters for which they were not qualified and for which no foundation was laid. More specifically, the defendant asserts that Richard McCaul, the Rock county coroner, Dr. Seraphim B. Teruel, a pathologist, and Allan Wilimovsky, the state's ballistics expert, should not have been permitted to testify that the spotting which appeared on Arreguin's face resulted from discharge residue from the gun and, in the case of McCaul and Wilimovsky, to give their opinions on the distance between the gun barrel and the victim at the time the shot was fired.

Coroner McCaul was qualified to testify as a lay expert. Opinion evidence of lay witnesses regarding matters within their field of experience is generally held to be competent, and the probative force of such testimony is for the trier of fact. *Perry Creek Cranberry Corp. v. Hopkins Agricultural Chemical Co.*, 29 Wis. 2d 429, 439, 139 N.W.2d 96 (1966). Such opinions are valid even though they are not based upon technical or academic knowledge but on expertise gained from experience. *Luke v. Northwestern National Casualty Co.*, 31 Wis. 2d 530, 535, 143 N.W.2d 482 (1966). McCaul, who had nearly twenty-seven years of experience as a coroner, testified that he had assisted in six to seven hundred autopsies, many of which involved gunshot wounds. He also testified, when shown a picture of Arreguin, that the spotting which appeared on Arreguin's face was consistent with other instances he had observed involving powder flecking or unburned powder hitting the face. Finally, McCaul testified that through past observations and study he was able to approximate the distance between the barrel and Arreguin at the time the gun was fired. This testimony was sufficient to establish McCaul's expertise as a lay expert and to lay a foundation for his opinion. Any inadequacy in his opinions went to the weight, not to the admissibility, of the testimony and

was for the jury to accept or reject. The trial court did not abuse its discretion in admitting McCaul's testimony.

Dr. Teruel and Mr. Wilimovsky were qualified to testify as expert witnesses:

". . . This court has long held that expert testimony should be adduced concerning matters involving special knowledge or skill or experience on subjects not within the realm of ordinary experience or knowledge of mankind. . . . The test or principal rule of admissibility of expert testimony is 'whether the members of the jury having that knowledge and general experience common to every member of the community would be aided in a consideration of the issues by the testimony offered and received.'
". . . .
". . . The jury has the power and the duty to determine the credibility of expert witnesses and the probative value of their testimony." *State v. Johnson,* 54 Wis. 2d 561, 564–65, 567, 196 N.W.2d 717 (1972) (citations omitted). *See also* sec. 907.02, Stats.

Dr. Teruel, who performed the autopsy on Arreguin, clearly qualified as an expert in pathology. Of the several hundred autopsies Dr. Teruel had performed, he estimated that fifteen involved gunshot victims. Dr. Teruel testified that, based on his experience and past observations of similar cases, the marks shown in the photograph of Arreguin were consistent with powder burns.

Mr. Wilimovsky, a ballistics expert with approximately thirty-two years of experience as a Firearms Identification Specialist, testified that he had previously seen "speckling" of the type on Arreguin's face. He identified it as "very minute metal particles and or bullet coating particles." The defendant did not object to this testimony and thereby waived his right to object on appeal to its admissibility. *See In re Spring Valley Meats, Inc.,* 94 Wis. 2d 600, 606, 288 N.W.2d 852 (1980). Wilimovsky also testified as to his opinion that the gun was fired three to four feet from Arreguin. In so testifying, Wilimovsky

stated that he was relying upon the characteristics of the wound and upon previous test-firings involved in other cases.

Based on this record, we conclude that both Teruel and Wilimovsky were experts qualified to testify as they did, and their testimony was premised on an adequate foundation. Therefore, the trial court did not abuse its discretion in admitting their testimony. Any questions as to the probative value of testimony on the spotting on Arreguin's face and the conclusions from that testimony as to the firing distance were for the jury to consider and weigh.

The defendant also raises the issue whether the state failed to turn over certain material evidence. Specifically, the defendant argues that the state based a question asked at trial on the existence of a coat Arreguin apparently was wearing at the time he was shot, but the state failed to turn over the coat prior to trial. The state gave the defendant access to its entire file and evidence inventory, in which were a photograph of the coat and portions of the coat recovered from the crime scene (the remaining portions of the coat may have been inadvertently lost or destroyed during the emergency treatment administered to Arreguin after he was shot). However, the defendant apparently failed to avail himself of the opportunity to inspect this evidence. The defendant thus failed to preserve his right to object on appeal to the state's alleged failure to turn over the evidence. We further note that the state's questioning did not relate to the evidence itself, but rather posed a hypothetical question about what would have resulted had Arreguin been wearing a coat. The introduction of the coat itself into evidence was not necessary for this line of questioning because the state was not trying to show that there was gunpowder residue on the coat. Rather, this line of ques-

tioning was designed to give the jury an explanation for the absence of gunpowder on Arreguin's shirt. In any event, the state introduced into evidence the portions of the coat which were recovered from the crime scene, thus providing evidence that Arreguin was wearing a coat.

The defendant also argues that the state improperly failed to turn over nitrate swabs taken from Arreguin's forehead. The defendant asserts that these swabs constituted material evidence because the presence or absence of discharge residue on Arreguin's face related to how far away the gun was discharged from Arreguin. If no discharge residue was detected, the defendant claims, it could have been argued that the shot was fired from a distance greater than that between Sarabia and Arreguin at the time of the shooting. The implication from this could have been that someone else fired the fatal shot. The defendant argues that the failure to make the evidence available denied him due process of law.

The defendant made a timely demand for all exculpatory evidence in the state's possession. In response, the state opened its file in the case for the defendant's inspection. Although nitrate swabs were taken of Arreguin's forehead, it is questionable whether the swabs were in the state's file. We assume for purposes of deciding this issue that the swabs were not in the file and, therefore, not made available to the defendant for inspection.

*Brady v. Maryland,* 373 U.S. 83 (1963), requires the prosecution to turn over exculpatory evidence to the defendant. In *United States v. Agurs,* 427 U.S. 97 (1976), the Supreme Court stated the test to be applied in determining whether due process was violated by the failure of the prosecution to turn over exculpatory evidence in response to a defendant's general discovery demand:

"The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by

evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Id.* at 112–13 (footnotes omitted).

Thus, under this test, the defendant's due process rights are violated only if the undisclosed evidence creates a doubt which did not otherwise exist. *See Ruiz v. State,* 75 Wis. 2d 230, 240, 249 N.W.2d 277 (1977); *Tucker v. State,* 84 Wis. 2d 630, 643, 267 N.W.2d 630 (1978); *Roe v. State,* 95 Wis. 2d 226, 247, 290 N.W.2d 291 (1980).

We conclude that the swabs would not have created a reasonable doubt which did not otherwise exist. Durante Carr testified that he saw Arreguin shot when the defendant was on the steps in front of Arreguin. Several witnesses testified that they saw only the defendant with a gun. The state's expert witnesses testified that there was discharge residue on Arreguin's face and that this indicated a close-range shot. The only way the swabs could have aided the defendant was if they detected no discharge residue. The implication from this could have been that the gun was fired from a longer range than the distance between the defendant and Arreguin at the time of the shooting. However, there was ample testimony and evidence introduced for the jury to find the defendant guilty beyond a reasonable doubt even if the swabs had not detected any discharge residue. Therefore, there was no breach of the state's constitutional duty to disclose exculpatory evidence. *See Agurs,* 427 U.S. at 108.

The other issues raised by the defendant but not addressed by the court of appeals, as to the second-degree murder conviction, are whether the verdict is supported by the evidence, whether a new trial is warranted in the interests of justice, and whether the trial court abused its discretion in sentencing the defendant.

"We test the sufficiency of the evidence leading to the conviction by the oft-stated rules as follows: This court must affirm if it finds that the jury, acting reasonably, could have found guilt beyond a reasonable doubt. The function of weighing the credibility of witnesses is exclusively in the jury's province, and the jury verdict will be overturned only if, viewing the evidence most favorably to the state and the conviction, it is inherently or patently incredible, or so lacking in probative value that no jury could have found guilt beyond a reasonable doubt." *Fells v. State*, 65 Wis. 2d 525, 529, 223 N.W.2d 507 (1974) (footnotes omitted).

Second-degree murder is defined as causing the death of another by conduct imminently dangerous to another and evincing a depraved mind, regardless of human life. Sec. 940.02, Stats. An eyewitness to the shooting, Durante Carr, testified that he saw Arreguin shot when Arreguin mounted the steps behind the defendant as they started to exit the bar. Witnesses testified that no one except the defendant had a gun or was seen with a gun. Owens, the only person who might have had access to a "house gun," testified he did not have a gun. The defendant admitted having a gun and firing it repeatedly in the bar. Wilimovsky, the ballistics expert, testified that the bullet recovered from Arreguin's body was consistent with the bullets test-fired from the defendant's gun. Based upon the spotting on Arreguin's face, Wilimovsky and Coroner McCaul estimated that the fatal shot was fired at close range to Arreguin. This supported the state's theory that the defendant fired the gun at Arre-

guin when they were on the bar steps. Based on this evidence, a jury could reasonably find beyond a reasonable doubt that the defendant fired the fatal shot and that this manifested imminently dangerous conduct evincing a depraved mind, regardless of human life.

The defendant contends that we should reverse his conviction because justice has miscarried. Sec. 751.06, Stats., gives this court the power to reverse the judgment of conviction if "it is probable that justice has for any reason miscarried." We have concluded that the jury, acting reasonably, could have convicted the defendant of the crime charged. A review of the record does not lead to the conclusion that the defendant's conviction constituted a miscarriage of justice. Accordingly, we decline to reverse the defendant's conviction.

The defendant asserts that the trial court abused its discretion in sentencing him to fifteen years on the second-degree murder conviction. We have previously recognized a strong policy against interference with the trial court's discretion in imposing sentence. *See State v. Killory,* 73 Wis. 2d 400, 408, 243 N.W.2d 475 (1976). An abuse of discretion will be found only when the trial court fails to exercise its discretion, *McCleary v. State,* 49 Wis. 2d 263, 277, 182 N.W.2d 512 (1971), or "where the sentence is so excessive and unusual and so disproportionate to the offense committed as to shock public sentiment and violate the judgment of reasonable people concerning what is right and proper under the circumstances." *Ocanas v. State,* 70 Wis. 2d 179, 185, 233 N.W. 2d 457 (1975). The primary factors the trial court must consider in imposing sentence are: (1) the gravity of the offense, (2) the character and rehabilitative needs of the offender, and (3) the need for protection of the public. *McCleary,* 49 Wis. 2d at 284 n. 3.

The trial court stated that it had considered the defendant's background and lack of prior record, that the defendant was a religious man with a strong sense of family and had many friends in the community, and that rehabilitation of the defendant was not a concern. The trial court considered the punitive and deterrent functions of sentencing. The court considered the effect of the disposition in this case as a deterrence to others inclined to use violence to settle their disputes or resolve their problems and frustrations. The court declared that violence cannot be condoned and that the violence of these acts required a penalty of sufficient magnitude to deter others. It also stated that it believed the offense was situational and thought it unlikely that the defendant would engage in other criminal activity again. However, the court concluded that the defendant's use of violence against another required imprisonment. The court stated that it would impose a moderate sentence. Based on this record, we conclude that the trial court properly exercised its discretion and that the imposition of a sentence of fifteen years was not excessive under the circumstances.

We find no merit in all other issues raised by the defendant in regard to the court of appeals' decision affirming the judgment of conviction for causing injury by conduct regardless of life and carrying a concealed weapon and the order denying the defendant's postconviction motions. Accordingly, we affirm the court of appeals on all issues except the issue relating to the lesser included jury instructions on the second-degree murder charge.

*By the Court.*—The decision of the court of appeals is reversed in part and affirmed in part.

SHIRLEY S. ABRAHAMSON, J. (concurring in part and dissenting in part). I agree with the majority that

regardless of whether all or part of the defendant's testi-. mony is construed as exculpatory, the general rule governing lesser included offense instructions is applicable— the court gives lesser included offense instructions when evidence exists that provides a rational basis for an acquittal on the greater charge and a conviction on the lesser one.

I also agree with the majority's decision to depart from its past practice of remanding the case to the court of appeals for that court to address issues not addressed in its original opinion although the issues had been briefed and could be decided by this court. See *supra*, pp. 666–674. As I have written previously, in the interest of judicial economy, speedy resolution of appeals, reduced costs to the litigants, and finality of decisions, if all the issues have been briefed I would have this court decide the entire case when it is before us on review.[1]

I write separately, however, because I conclude, as did the court of appeals, that the evidence warranted jury instructions on several lesser included offenses as requested by the defendant.

The standards for determining when an offense is "lesser included" are found in sec. 939.66, Stats. 1981–82. Sec. 939.66(2) provides a special rule for lesser included offenses applicable to homicide cases: all less serious types of criminal homicide are considered to be included within all more serious types of homicide. Thus manslaughter (imperfect self-defense), sec. 940.05(2),[2]

---

[1] See, *e.g.*, *Soquet v. Soquet*, 117 Wis. 2d 553, 561, 345 N.W.2d 401 (1984) (Abrahamson, J., concurring); *Shopper Advertiser v. Department of Rev.*, 117 Wis. 2d 223, 236, 344 N.W.2d 115 (1984) (Abrahamson, J., concurring and dissenting); *Radtke v. City of Milwaukee*, 116 Wis. 2d 550, 558, 342 N.W.2d 435 (1984) (Abrahamson, J., concurring and dissenting); *Crown Life Ins. Co. v. LaBonte*, 111 Wis. 2d 26, 45, 330 N.W.2d 201 (1983) (Abrahamson, J., concurring and dissenting).

[2] Manslaughter under sec. 940.05(2), Stats. 1981–82, requires causing the death of a human being "unnecessarily, in the exercise of his privilege of self-defense or defense of others. . . ."

and homicide by reckless conduct, sec. 940.06, are lesser included offenses when the charge is second-degree murder as in this case.[3]

I conclude that the circuit court was required, for example, to instruct the jury on manslaughter (imperfect self-defense). To justify an instruction on manslaughter (imperfect self-defense) there must be evidence to afford grounds for a jury to find that the elements of second-degree murder have been established beyond a reasonable doubt and that the defendant committed the act causing the death believing that the act was necessary in self-defense, but that his belief was unreasonable under the circumstances. See Wis. J.I.—Cr. 1140;[4] Dickey and Fullin,

---

[3] Homicide by reckless conduct under sec. 940.06(2), Stats. 1981–82, requires "an act which creates a situation of unreasonable risk and high probability of death or great bodily harm to another. . . ."

[4] Wis. J.I.—Cr. 1140 reads as follows:

"MANSLAUGHTER: CAUSING DEATH OF ANOTHER UNNECESSARILY IN THE EXERCISE OF SELF-DEFENSE: FIRST AND SECOND DEGREE MURDER SUBMITTED[1]

"Manslaughter, as defined in section 940.05(2) of the Criminal Code of Wisconsin, is committed by one who causes the death of another human being unnecessarily, in the exercise of his privilege of self-defense.

"Before the defendant may be found guilty of manslaughter for causing the death of another unnecessarily, in the exercise of his privilege of self-defense, you must be satisfied beyond a reasonable doubt that there were present the following three elements of this offense:

"First, there must exist all of the elements of either first or second degree murder as I have defined them to you;

"Second, the killing must not have been privileged under the law of self-defense as I have defined that privilege for you;

"Third, the defendant must have killed ................... believing that his act was necessary in self-defense but his belief was unreasonable under the circumstances. In other words he believed that his action was necessary in the exercise of his privilege of self-defense but actually his belief was unreasonable

*Modernizing Wisconsin's Homicide Statutes,* Jan. 1984 Wis. Bar Bull. 14.

To enable the jury to find the defendant guilty of second-degree murder under sec. 940.02(1), Stats. 1981–82, the state must prove three elements. The first statutory element is that the defendant caused the death of another human being. The second element is that the death was caused by "conduct imminently dangerous to another." Conduct imminently dangerous to another has been defined by this court as "conduct that is dangerous in and of itself . . . inherently and consciously dangerous to life and not such as might casually produce death by misadventure." *Hogan v. State,* 36 Wis. 226 (1874). See also Wis. J.I.—Cr. 1130.

---

because a reasonable person would not have believed that he was privileged at all to use force under the circumstances or a reasonable person would not have used as much force as was used by the defendant. In determining whether the defendant's belief was reasonable, you must consider the question from the standpoint of the defendant at the time of his actions and not from the viewpoint of the jury now.

"The standard you must apply is what a person of ordinary intelligence and prudence would have done in the position of the defendant under the circumstances existing at the time of the alleged offense. In applying this standard, you must consider whether a reasonable person would have believed that he was privileged to act in self-defense and whether he would have believed that the amount of force used was proper under the circumstances.

"If you are satisfied beyond a reasonable doubt from the evidence in this case that the defendant caused the death of ....
................ in a manner constituting murder in the first or second degree, but you find that the defendant committed the act causing ....................'s death believing that his act was necessary in self-defense but that his belief was unreasonable under the circumstances, then you should find defendant guilty of manslaughter.

"If, however, you are not so satisfied, then you must find the defendant (not guilty) (not guilty of manslaughter)."

The third statutory element of second-degree murder is that the conduct must evince "a depraved mind, regardless of human life." In *State v. Weso*, 60 Wis. 2d 404, 411–12, 210 N.W.2d 442 (1973), the court described a depraved mind as follows:

"To constitute a depraved mind, more than a high degree of negligence or recklessness must exist. The mind must not only disregard the safety of another but be devoid of regard for the life of another. . . . The statute gives one element of a depraved mind, namely, a disregard for human life. . . . A depraved mind has a general intent to do the acts and the consciousness of the nature of the acts and possible result but lacks the specific intent to do the harm."

See also *State v. Dolan*, 44 Wis. 2d 68, 73–74 and n. 2, 170 N.W.2d 822 (1969).

This court has also said that conduct which evinces a "depraved mind" lacks "justification or excuse." Justification or excuse which bears a relationship to the conduct is inconsistent with the type of conduct which evinces a complete disregard for the life of another. See, *e.g.*, *State v. Dolan, supra*, 44 Wis. 2d at 73–74, n. 2; *State v. Weso, supra*, 60 Wis. 2d at 412.

The majority must first ask whether the evidence in the case is sufficient to prove guilt of second degree murder. At this stage of the analysis all evidence relating to the justification or excuse of imperfect self-defense must be rejected. I agree with the majority that an instruction on second-degree murder, the greater offense, was required in this case.

The question then becomes whether an instruction on the lesser offense of manslaughter was required because there was sufficient evidence to establish both guilt of manslaughter and a reasonable ground for acquittal of second-degree murder. At this stage of the analysis the majority should look at the record to see if there is evi-

dence of imperfect self-defense; such evidence would be sufficient to establish guilt of manslaughter and a reasonable basis for acquittal of second-degree murder on the ground that the conduct did not evince a depraved mind. Without discussion or analysis of the defendant's testimony and that of the other witnesses as to the defendant's claim of self-defense, the majority opinion merely concludes that there is no evidence in the record that raises a reasonable doubt that the defendant's conduct evinced a depraved mind. *Supra* p. 666.

I conclude that the record contains sufficient evidence of justification or excuse to sustain a conviction of manslaughter (imperfect self-defense) and to leave reasonable doubt that the conduct evinced a depraved mind (second-degree murder).

The defendant testified that he feared the bartender would kill him. The defendant testified that he knew a gun was near the cash drawer. The bartender testified that he walked to the cash register in search of a gun that was kept there. The defendant admitted firing two shots toward the bartender. He denied shooting his pistol down the stairwell. The defendant testified that he did not know that the victim was following him. The defendant testified that he was concerned about the bartender and the patrons jeopardizing his safety. Patrons of the bar testified that the defendant fired four shots, the last of which struck the victim, and that no one else appeared to have a gun. There was evidence that all the shots were fired in ten seconds or less.

When considering the evidence before it, the jury is not confined in its findings to matters that are directly set forth in the testimony, but may draw reasonable inferences from the testimony. The jury may, for example, base an inference of a lesser included offense on a reconstruction of events that is fairly inferable from the

evidence, that is gleaned from putting together all the testimony and the jury's own experiences.

The jury in this case could have reasonably concluded on the basis of all the evidence that the defendant was mistaken as to the number of shots he fired and that he had fired all the shots in the unreasonable belief that he had to defend himself against the bartender or a patron. The trial court instructed the jury on self-defense as to the defendant's shooting the bartender. The evidence justifying the self-defense instruction coupled with the evidence that the defendant was afraid that other patrons of the bar would attack him would have supported a jury finding that the defendant's shooting the victim, who was his friend and accomplice, was not conduct evincing a depraved mind, regardless of human life, but was a killing of an "innocent" third party under an unreasonable belief that the shooting was necessary in self-defense.

A similar analysis should have been employed by the trial court and the majority before concluding that the requested instructions on a lesser included offense were not required.

For the reasons set forth, I cannot join the result reached by the majority. I would affirm the decision of the court of appeals.